

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 19, 2015**

_Barbara J. Houser_

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 14-35043-BJH** |
| **SAMUEL E. WYLY,** | § | **(Chapter 11)** |
| | § | **(Jointly Administered)** |
| DEBTOR. | § | |
| | § | |
| **TORIE STEELE,** | § | **ADV. PROC. NO. 14-03142-BJH** |
| | § | |
| PLAINTIFF, | § | **RELATED TO DKT. NOS. 9 & 25** |
| v. | § | |
| | § | |
| **SAMUEL E. WYLY,** | § | |
| | § | |
| DEFENDANT. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are cross motions for summary judgment in this adversary proceeding

brought by Torie Steele ("**Torie**") against her ex-husband and debtor in this bankruptcy case,

Samuel E. Wyly ("**Sam**"), seeking a determination that a claim held by Torie against Sam is not

dischargeable. Oral argument on both motions was held on February 2, 2015. Both Torie's motion for summary judgment ("**Torie's Motion**") and Sam's cross-motion for summary judgment ("**Sam's Cross-Motion**") are now ripe for ruling. Because this Court concludes that (i) Torie's claim against Sam is in the nature of spousal support, and (ii) Sam has failed to raise a legitimate dispute on an issue of material fact for trial, Torie's Motion will be granted and Sam's Cross-Motion will be denied.

## I.    BACKGROUND FACTS

The primary relevant facts are set forth in three documents submitted as exhibits in support of Torie's Motion. Sam adopts these exhibits in support of his response to Torie's Motion and in support of Sam's Cross-Motion.

Sam and Torie (then Victoria Lee Wyly) were divorced on June 15, 1991 in California. By that time, both Sam and Torie had achieved some measure of professional success and owned a considerable amount of property. In connection with their divorce, on September 23, 1991, the Superior Court of California, County of Los Angeles (the "**Los Angeles Superior Court**") entered a judgment (the "**Divorce Judgment**") which divided marital property and provided for spousal and child support to be paid by Sam, among other things. Torie's Ex. 1;[1] *In re the Marriage of Wyly* (Super. Ct. L.A. County, 1991, No. D-226-386). None of the provisions of the Divorce Judgment are directly at issue in this adversary proceeding, but an overview of the Divorce Judgment will be helpful.

The first eleven sections of the Divorce Judgment divided the couple's assets and liabilities. The Divorce Judgment confirmed interests in separate property, Torie's Ex. 1 ¶¶ 1-2, App. 5-9, and divided specific items of community property, *id.* ¶¶ 3-4, App. 9-13. It also

---

[1] Torie's exhibits are included in an appendix to Torie's Motion that was filed on the docket in this adversary proceeding as ECF No. 11. The appendix has separate page numbers. Pincites to materials within each exhibit will be cited with reference to subdivisions within exhibits, if any, and to the appendix page number. So, for example, paragraph 1.1 of Exhibit 2 will be cited as Torie's Ex. 2 ¶ 1.1, App. 30.

assigned community debts and reconciled claims between Sam, Torie, and the community.  *Id.* ¶¶ 5-8, App. 16-18.  After dealing with specific assets and claims, the Divorce Judgment ordered Sam to pay $4,193,105 to Torie "[t]o equalize the division of community property and liabilities" (the "**Equalizing Payment**").  *Id.* ¶ 9, App. 18-19.  If any community property was discovered after entry of the Divorce Judgment, it was to be divided equally, *id.* ¶ 10, App. 19, and any debt not specifically addressed in the Divorce Judgment was declared the responsibility of the party who had incurred it, *id.* ¶ 11, App. 19-20.

Paragraph 12 of the Divorce Judgment ordered Sam to pay Torie $40,000 per month in spousal support until May 31, 1993.  *Id.* ¶ 12, App. 20-21.  On that date, the Los Angeles Superior Court would "lose jurisdiction to order or continue spousal support" barring a prior order extending its jurisdiction to do so.  *Id.*  The Divorce Judgment permitted Sam to reduce the monthly payment of $40,000 by the amount of any payments actually received by Torie from Torie Wyly, Inc., but noted the assumption that Torie would receive no such payments.  *Id.* ¶ 12.1, App. 20-21.[2]  However, the Divorce Judgment required Sam to continue making a monthly $60,000 payment to Torie pursuant to the *pendent lite* support order until Torie received the Equalizing Payment.  *Id.* ¶ 12.2, App. 21.

The remaining sections of the Divorce Judgment deal with child custody, child support, and other matters not relevant to the present dispute.

The obligation at issue here was created two years after the Divorce Judgment became final and resolved a dispute that arose shortly after the entry of the Divorce Judgment. Specifically, on February 5, 1992, Torie filed a Renewed Order to Show Cause in the Los Angeles Superior Court in which she apparently sought a modification of the Divorce Judgment and continuation of spousal support past the May 31, 1993 termination date set forth in the

---

[2]  The nature of Torie Wyly, Inc. is not clear from the summary judgment record.

Divorce Judgment, among other things.[3]  On June 15, 1993, Torie and Sam reached a "full and complete settlement of the issues" raised by Torie's Renewed Order to Show Cause, which settlement was incorporated into an agreed order (the "**Order Amending Judgment**") entered by the Los Angeles Superior Court on July 1, 1993.  Torie's Ex. 2, App. 29.

The first substantive provision of the Order Amending Judgment obligated Sam to act as "investment manager and counselor" to Torie for life (the "**Investment Provision**").  *Id.* ¶ 1, App. 30.  Specifically, the parties agreed that Torie would give Sam $5,000,000 in capital to invest for her on which he guaranteed a 10% annual return.  *Id.*  Through this guaranteed annual return provision, Sam guaranteed that Torie "will receive cash payments from such investments in an aggregate of at least $500,000 per year in investment income, payable in monthly installments . . . of not less than $41,666 per month."  *Id.*  If Sam's investment advice or activities generated annual returns in excess of the 10% guaranteed return, Torie agreed that Sam would receive half of the excess, but if his investment advice or activities did not generate a 10% annual return, payable in equal monthly installments of $41,666, Sam was required to make up any shortfall monthly out of his own pocket.  In other words, if the investment return in any month was less than $41,666, Sam was required to fund the difference from his own assets.  *Id.* ¶¶ 1-1.1, App. 30.  Sam further agreed to "use his best efforts to assure that the guaranteed return of at least 10 percent per annum . . . is free and clear of federal and state income or other taxation" to Torie and to provide her with regular statements.  *Id.* ¶¶ 1.2-1.3, App. 30-31.  The $5,000,000 of principal remained Torie's property, and Sam was obligated to return it to her promptly if she exercised her option to suspend or terminate the Investment Provision.  *Id.* ¶ 1.4, App. 31-32.

---

[3]  Neither party provided a copy of the Renewed Order to Show Cause referenced in the Order Amending Judgment. The information recited about the Renewed Order to Show Cause is gleaned from reading the Order Amending Judgment.

The Order Amending Judgment imposed several other obligations on the parties. For example, Sam was required to cause a house in Malibu that he indirectly owned to be sold to Torie for $2,000,000. *Id.* ¶ 2, App. 32. Sam was required to make a $400,000 down payment on Torie's behalf, although Torie would be liable to make monthly payments on the remainder of the debt evidencing the purchase price ($1,600,000), with her obligation secured by a deed of trust on the property. *Id.* Sam was also required to provide health insurance for Torie for life. *Id.* ¶ 3, App. 33. In addition to providing her with insurance coverage, Sam was obligated to pay all of Torie's medical costs for life to the extent they exceeded 20% of her actual income from the Investment Provision in any calendar year. *Id.* ¶ 3.2, App. 33-34.

The Order Amending Judgment deleted ¶¶ 12.1 and 12.2 of the Divorce Judgment, which provided for modification of the original $40,000 support award (either up or down) in certain circumstances, and amended ¶ 12 of the Divorce Judgment to require Sam to pay $22,500 in additional spousal support to Torie on June 20, 1993. *Id.* ¶ 4, App. 34.[4] And, significantly, the Order Amending Judgment extended the Los Angeles Superior Court's jurisdiction to award additional spousal support to Torie in the event that she failed to receive a 10% return pursuant to the Investment Provision or if Sam refused to return her investment principal upon request. *Id.* The Order Amending Judgment made no other alterations or references to specific provisions in the Divorce Judgment.

---

[4] Recall that (i) spousal support under the Divorce Judgment terminated on May 31, 1993, unless extended by further court order, Torie's Ex. 1, ¶ 12, App. 20, (ii) Torie sought to have support modified and extended by her Renewed Order to Show Cause filed on February 5, 1992, (iii) Torie and Sam agreed to the terms of the Order Amending Judgment on June 15, 1993, Torie's Ex. 2, App. 29, and (iv) from and after June 20, 1993—the date by which Sam was required to pay the $22,500 of support to Torie—the Los Angeles Superior Court "shall have and retain jurisdiction . . . to award additional spousal support to [Torie]" if Sam's investment advice and activities failed to produce investment income of at least 10% per annum or if Sam failed to return Torie's capital to her upon her request, Torie's Ex. 2, ¶ 4, App. 34. From these facts the Court infers that the $22,500 additional spousal support payment the parties agreed Sam would make to Torie provided her with an approximate proportionate share of the previously ordered $40,000 monthly support from June 1, 1993 through June 15 or 20, 1993, after which the newly agreed-to Investment Provision went into effect as a substitute for the spousal support originally ordered in the Divorce Judgment.

Sam's obligations under the Order Amending Judgment were to "inure to the benefit of [Torie] and her heirs, administrators, executors, successors and assigns, and be a charge against the Estate of [Sam]." *Id.* ¶ 11, App. 36-37. The remainder of the provisions of the Order Amending Judgment concern issues like fees and notice and are not at issue here.

The Los Angeles Superior Court revisited *In re Marriage of Wyly* in response to orders to show cause filed by Torie in 2003 and by Sam in 2004. The Los Angeles Superior Court's resolution of those disputes is contained in an Amended and Final Findings/Statement of Decision on Orders to Show Cause Heard at Evidentiary Trial entered on May 23, 2007 (the "**2007 Decision**"). Torie's Ex. 3, App. 38. The 2007 Decision resolved claims between Torie and Sam involving the application of the Investment Provision to the complex dealings actually undertaken by the parties after entry of the Order Amending Judgment. Suffice it to say that Torie did not simply place $5,000,000 with Sam for investment during the intervening years as contemplated by the Investment Provision, and it appears that Sam was not actively managing any of Torie's money at the time of the 2007 Decision. Many of the findings contained in the 2007 Decision are irrelevant here, but certain of those findings are instructive, as they concern the intent with which Torie and Sam agreed to the terms of the Order Amending Judgment after the Los Angeles Superior Court heard evidence from the parties over several days.

As the Los Angeles Superior Court explained in the 2007 Decision, the Renewed Order to Show Cause filed by Torie on February 5, 1992 (that was resolved by agreement as set forth in the Order Amending Judgment) sought a determination that "spousal support be continued on [Torie]'s behalf." Torie's Ex. 3, App. 39-40. In the 2007 Decision, the Los Angeles Superior Court found that the Order Amending Judgment contained "language [that] is straightforward and unambiguous as it was originally written and was to be performed." *Id.* at App. 41-42. The

Los Angeles Superior Court then explained the parties' intent in agreeing to the terms of the Order Amending Judgment as follows:

> The Court finds that at the time the parties signed the OAJ [Order Amending Judgment] in 1993, the parties' intent in connection with it was as set forth in the OAJ, as follows: Petitioner wished to have a reliable source of income every month for her support. Respondent was agreeable to providing a monthly guaranteed stream of income to Petitioner rather than face a hearing on spousal support. Respondent was agreeable to taking his chances with his acumen as an investor as opposed to risk incurring any further spousal support obligations. Therefore, Respondent was agreeable to providing Petitioner with the Guaranty on Petitioner's Principal. Accordingly, the Court finds that it was mutually advantageous for the parties to enter into the OAJ.

*Id.* at App. 43. The Los Angeles Superior Court then made two further findings that are relevant here—*i.e.*, (i) "[t]he Court finds that the original intent of the OAJ shall be the basis for the parties' future conduct with respect to their rights and obligations in connection with the OAJ," *id.*, and (ii) "[t]he Court finds that this investment plan is a substitute for spousal support," *id.* at App. 54. Finally, and consistent with the idea that the guaranteed investment returns were a substitute for spousal support, the Los Angeles Superior Court required Sam to pay Torie *pendent lite* spousal support during the course of the trial leading to the issuance of the 2007 Decision. *Id.* at App. 55.

The Los Angeles Superior Court also referenced spousal support in connection with a challenge to its continued jurisdiction in its 2007 Decision:

> The Court finds that Paragraph 4 of the OAJ is an agreement by the parties that the Court will continue to have jurisdiction over: (1) spousal support until the death of [Torie] or [Sam], and (2) whether to award additional spousal support to [Torie] (*i.e.*, an amount over zero, because the spousal support is now zero under the agreement) under certain circumstances. Therefore, the Court finds that [Sam]'s claim that jurisdiction over spousal support should be terminated pursuant to Family Code, Section 4322 should be denied.

*Id.*

## II.    PROCEDURAL HISTORY

Sam filed a voluntary petition under chapter 11 of title 11 of the U.S. Code (title 11 will be referred to as the "**Bankruptcy Code**") on October 19, 2014.[5]  Sam's bankruptcy case is jointly administered as case number 14-35043 with the bankruptcy case of Sam's sister-in-law, Caroline "Dee" Wyly.

Torie filed this adversary complaint on November 6, 2014, alleging that the Investment Provision in the Order Amending Judgment created an obligation of Sam to Torie that could not be discharged in bankruptcy pursuant to § 523(a)(5) of the Bankruptcy Code.[6]  Sam filed an answer on December 8, 2014, asserting various affirmative defenses.

On December 12, 2014, Torie filed Torie's Motion, seeking summary judgment in her favor pursuant to Fed. R. Civ. P. 56, as made applicable here by Fed. R. Bankr. P. 7056.  Torie's Motion was supported by a brief, ECF No. 10 ("**Torie's Summary Judgment Brief**"), and an appendix containing her three exhibits, ECF No. 11.  On January 2, 2015, Sam filed a response opposed to Torie's Motion, ECF No. 14, which also contained Sam's Cross-Motion, separately docketed as ECF No. 25, in which he seeks a summary judgment in his favor on Torie's claim under § 523(a)(5).  Sam supported both his response and Sam's Cross-Motion with a brief, ECF No. 15 ("**Sam's Response Brief**"), and an appendix of his own, ECF No. 16.  On January 22, 2015, Torie filed a consolidated reply to Sam's response and Sam's Cross-Motion, ECF No. 19,

---

[5]  Sam's bankruptcy petition was precipitated by the entry of a disgorgement order against him following a jury verdict on nine counts of securities fraud.  *SEC v. Wyly*, No. 1:10-CV-05760 (S.D.N.Y Oct. 9, 2014), ECF No. 481.

[6]  Though Torie's complaint only cites § 523(a)(7), it is clear from the complaint and the subsequent filings that this claim rests on a theory of nondischargeability under § 523(a)(5).  "The form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim."  *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. 1981).  Torie's adversary cover sheet and subsequent pleadings make clear that, in this adversary proceeding, she asserted a claim under § 523(a)(5).  Form B104, ECF No. 2.  In his answer, Sam pointed out the discrepancy between the statute cited and the substance of Torie's complaint, answering to both.  Debtor's Answer to Compl. to Determine Nondischargeability of Debt, ECF No. 8, ¶¶ 5, 16.  The parties and the Court have since proceeded to consider a claim for relief solely under § 523(a)(5).

which was supported by a brief ("**Torie's Reply Brief**"), ECF No. 20. Torie's Reply Brief was accompanied by an affidavit (the "**Torie Affidavit**") containing factual statements regarding Sam's and her relative financial positions at the time of the Divorce Judgment and the Order Amending Judgment. On January 26, 2015, Sam filed a Reply, ECF No. 26, accompanied by a brief in support ("**Sam's Reply Brief**"), ECF No. 27.

Sam's appendix includes four exhibits ("**Sam's Exs.**"). Sam's Ex. A documents a compromise agreement between Sam and Torie in 2008 by which she would briefly remove (for tax purposes) and then return her principal to him for investment. Sam's Ex. B includes financial summaries of the performance of Torie's investments under the Investment Provision from 2008 to 2014. Sam's Ex. C is an excerpt from a book published in 2010 describing Torie's business activities breeding and showing Wire Fox Terrier dogs and referencing her fashion boutiques. Sam's Ex. D is an article published in The Malibu Times on February 19, 2014 that provides additional detail on the success of a particular dog co-owned by Torie at national dog shows and how Torie came to breed and show Wire Fox Terriers.

Sam objected to statements in ¶ 7 of Torie's Affidavit recounting information she heard or read about Sam's wealth. Torie has not objected to any of Sam's exhibits.

The Court heard argument on Torie's Motion and Sam's Cross-Motion on February 2, 2015, and took both motions under advisement.

## III.   LEGAL ANALYSIS

### A.   Jurisdiction and Constitutional Authority

The U.S. District Court for the Northern District of Texas has subject matter jurisdiction over Sam's bankruptcy case pursuant to 28 U.S.C. § 1334. Although bankruptcy courts do not have independent subject matter jurisdiction over bankruptcy cases and proceedings, 28 U.S.C.

§ 151 grants bankruptcy courts the power to exercise certain "authority conferred" upon the district courts by title 28. Under 28 U.S.C. § 157, the district courts may refer bankruptcy cases and proceedings to the bankruptcy courts either for entry of a final judgment (core proceedings) or for submission of proposed findings and conclusions (noncore, related-to proceedings). This Court exercises jurisdiction over Sam's chapter 11 bankruptcy case pursuant to the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in this district on August 3, 1984. Venue is proper here under 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

**B.** **Summary Judgment Standard**

In deciding a motion for summary judgment, a court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56, as made applicable here by Fed. R. Bankr. P. 7056. In deciding whether a fact issue has been raised, the facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007).

A court's role at the summary judgment stage is not to weigh the evidence or determine the truth of the matter, but rather to determine only whether a genuine issue of material fact exists for trial. *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001) ("[T]he court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.") (citing *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 135 (2000)); *see also U.S. v. An Article of Food Consisting of 345/50 Pounds Bags*, 622 F.2d 768, 773 (5th Cir. 1980) (The court "should not proceed to assess the probative value of any of the

evidence."). While courts must consider the evidence with all reasonable inferences viewed in the light most favorable to the non-movant, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pylant v. Hartford Life & Acc. Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"After the movant has presented a properly supported motion for summary judgment, the burden shifts to the nonmoving party to show with significant probative evidence that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (internal quotation marks omitted). However, where "the burden at trial [as to the material fact at issue] rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

As applied here then, when considering Torie's Motion, the Court views the Order Amending Judgment and other evidentiary material in the light most favorable to Sam. Torie bears the burden at trial, so Torie's Motion must be supported by sufficient factual material to make out a prima facie case that the debt created by the Investment Provision was in the nature of support. Torie's Motion rests on the Order Amending Judgment itself, illuminated by the Divorce Judgment and the 2007 Decision. If these documents sufficiently support a judgment in her favor, Sam can still avoid summary judgment being taken against him by showing a disputed issue of material fact for trial.

Conversely, when considering Sam's Cross-Motion, the Court views the facts in the light most favorable to Torie. Sam is entitled to summary judgment in his favor simply by showing that Torie has failed to show a triable issue of material fact supporting her claim that the debt created by the Investment Provision was intended as support. Torie is careful to point out that the Torie Affidavit, attached to her Reply Brief, was submitted only to oppose Sam's Cross-Motion.

Both Torie and Sam agree that the Order Amending Judgment unambiguously reveals their mutual intent when they created the Investment Provision: to avoid a judicial award of spousal support. Sam's Response Br. ¶ 33; Torie's Reply Br. ¶¶ 1, 37; Sam's Reply Br. ¶ 19. However, their positions diverge as to the legal consequences of that intent under the Bankruptcy Code. Therefore, the Court will first determine whether the Order Amending Judgment unambiguously establishes whether the parties intended the Investment Provision to create a debt that is "in the nature of . . . support." 11 U.S.C. § 101(14A)(B). If it does, Torie's Motion must be granted. If it does not, the Court will then determine whether factual disputes remain for trial in the context of Torie's Motion or Sam's Cross-Motion.

### C.    Torie's Claim of Nondischargeability pursuant to 11 U.S.C. § 523(a)(5)

Section 1141 of the Bankruptcy Code provides for a discharge of all claims against a debtor other than those claims specifically made non-dischargeable by § 523 of the Bankruptcy Code. This is the "fresh start" central to the purpose of the American bankruptcy system. *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *see also Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

Section 523(a) sets forth several types of claims Congress has chosen to place beyond the reach of the bankruptcy discharge, including any debt for a "domestic support obligation." 11

U.S.C. § 523(a)(5).[7] The burden of proof falls on the party seeking to establish that the obligation is non-dischargeable. *Grogan v. Garner*, 498 U.S. at 283; *In re Benich*, 811 F.2d 943, 945 (5th Cir. 1987). Courts construe domestic support obligations more broadly than other exceptions to discharge to ensure that the Bankruptcy Code does not become a tool to allow debtors to escape familial obligations. *See Milligan v. Evert (In re Evert)*, 342 F.3d 358, 367 (5th Cir. 2003); *accord Jones v. Jones (In re Jones)*, 9 F.3d 878, 881-82 (10th Cir. 1993).

The term "domestic support obligation" is defined in Section 101(14A) of the Bankruptcy Code and

> means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is—
>> (A) owed to or recoverable by—
>>> (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>>> (ii) a governmental unit;
>> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
>> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of—
>>> (i) a separation agreement, Divorce Judgment, or property settlement agreement;
>>> (ii) an order of a court of record; or
>>> (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
>> (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

---

[7] Section 523(a)(5) was amended in 2005. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005). Among other things, the amendment simplified the language of § 523(a)(5) by referencing the newly created definition of domestic support obligation § 101(14A). Though the key phrase "in the nature of alimony, maintenance, or support" found a new home in § 101(14A), cases interpreting that phrase as it existed in § 523(a)(5) retain their weight of authority notwithstanding the amendment. *In re Beacham*, 520 B.R. 561, 565-66 (Bankr. S.D. Tex. 2014).

11 U.S.C. § 101(14A).

Here, there is no dispute that Torie is Sam's former spouse, that the Investment Provision in question was created by the Order Amending Judgment in connection with their divorce, and that the agreement has not been assigned to a nongovernmental entity. Thus, the parties agree that the only dispute before the Court is whether the Investment Provision creates a debt owing to Torie that is "in the nature of alimony, maintenance, or support." 11 U.S.C. § 101(14A)(B).

"Domestic law principles are particularly within the domain of the state courts," and bankruptcy courts are not to ignore the guidance of state courts entirely. *Yeates v. Yeates (In re Yeates)*, 807 F.2d 874, 877-78 (10th Cir. 1986). Ultimately, however, federal law controls questions of exceptions to discharge. *Biggs v. Biggs (In re Biggs)*, 907 F.2d 503, 504 (5th Cir. 1990) (citing legislative history). To determine whether an obligation is in the nature of alimony, maintenance, or support, bankruptcy courts look beyond the labels of a divorce judgment or separation agreement to determine the parties' intent at the time the agreement was executed. *In re Evert*, 342 F.3d 358, 368 (5th Cir. 2003) (involving an agreement); *In re Dennis*, 25 F.3d 274, 277 (5th Cir. 1994) (involving a judicial decree). "A written agreement between the parties is persuasive evidence of their intent." *In re Evert*, 342 F.3d at 368. In sum, "[r]esolution of this issue requires a determination of the intention of the parties, as reflected by the substance of the agreement, viewed in the crucible of surrounding circumstances as illuminated by applicable state law." *Crist v. Crist (In re Crist)*, 632 F.2d 1226, 1229 (5th Cir. 1980).

Some context will be helpful to illuminate the issue. As Sam's counsel admitted at the hearing on Torie's Motion and Sam's Cross-Motion, divorcing spouses incur obligations to each other either to (i) divide property interests, or (ii) balance the parties' anticipated financial needs.

The Bankruptcy Code considers the former to be a property settlement and the latter to be support. So, for example, a divorced husband who gave an unsecured note to his ex-wife in exchange for her interests in real property did so in connection with a property settlement. *Tilley v. Jessee*, 789 F.2d 1074 (4th Cir. 1986). On the other hand, a divorced husband who became personally obligated to repay a loan secured by a second mortgage on his ex-wife's residence did so in connection with a support obligation. *Yeates*, 807 F.2d 874.

These obligations can be difficult to categorize, partly because parties to a separation agreement or marital dissolution agreement sometimes structure their obligations in unique ways to secure favorable tax treatment[8] or to accommodate liquidity issues. Furthermore, some states do not permit courts to award alimony, but they do permit courts to consider factors related to spousal support when dividing marital property. *Evert*, 342 F.3d at 364. Where an agreement or decree is ambiguous for this or other reasons, courts examine extrinsic evidence to determine the purpose a given obligation was intended to serve. *Id.* at 368; *Benich*, 811 F.2d at 945.[9]

However, courts need not consider extrinsic evidence of intent "if the agreement between the parties clearly shows that the parties intended the particular debt in question to reflect either support or a property settlement." *Evert*, 342 F.3d at 368. In such a situation, "that characterization will normally control." *Id.* The written agreement is "'persuasive evidence of intent.'" *Id.* at 370 (quoting *Yeates*, 807 F.2d at 878). An unambiguous written agreement

---

[8] Under the tax code, spousal support is included in gross income of the supported spouse and allowed as a deduction to the supporting spouse. 26 U.S.C. §§ 71, 215. Separation agreements can be structured to favorably allocate the income tax consequences to the spouses of the support obligation.

[9] The Fifth Circuit set forth a list of factors it found most relevant when considering whether an obligation in a Texas divorce judgment, before Texas awarded alimony, was dischargeable under the Bankruptcy Act. *Nunnally v. Nunnally (In re Nunnally)*, 506 F.2d 1024, 1026 (5th Cir. 1975). The Fifth Circuit has continued to find these factors helpful when faced with Texas divorce judgments under the Bankruptcy Code. *See, e.g.*, *Dennis*, 25 F.3d at 279; *Joseph v. Joseph (In re Joseph)*, 16 F.3d 86, 88 (5th Cir. 1994). However, those factors may not be as relevant to cases involving settlement agreements or where state law recognizes alimony, as here. *Evert*, 342 F.3d at 368.

"'erect[s] a substantial obstacle' for the party challenging its express terms to overcome." *Id.* at 370 (quoting *Tilley*, 789 F.2d at 1078).

With this background firmly in mind, the Court will analyze the documentary evidence—*i.e.*, the Order Amending Judgment as illuminated by the Divorce Judgment and the 2007 Decision—to determine whether it "clearly establishes the nature of the obligation" at issue here. *Id.* at 371. If it does so, it will normally control, and extrinsic evidence need not be considered.

According to Torie, in determining whether an obligation constitutes support, the *Dennis* court "described 'a nonexclusive list of factors which bankruptcy courts should review in deciding whether a divorce obligation constitutes alimony, maintenance, or support.'" Torie's Reply Br. ¶ 15. However, also according to Torie, in *Evert*, the Fifth Circuit held that consideration of the *Dennis* factors[10] is not necessary when the parties' intent can be determined by the divorce decree itself:

> A written agreement between the parties is persuasive evidence of their intent. Thus, if the agreement between the parties clearly shows that the parties intended the particular debt in question to reflect either support or a property settlement, then that characterization will normally control. On the other hand, if the agreement is ambiguous, then the court must determine the parties' intentions by looking to extrinsic evidence.

*Evert*, 342 F.3d at 368 (citations omitted), *quoted in* Torie's Reply Br. ¶ 16.

*Evert* involved a note owed by the debtor, which the ex-spouse asserted was in the nature of support. According to Torie, the Fifth Circuit looked at the agreed divorce decree and noted five factors which led it to determine the parties' intent as to the nature of the note based solely on the language of the document. Torie's Reply Br. ¶ 17. Torie reads the five factors as follows:

   a. First, whether the obligation fell within property settlement provisions or support obligation provisions of the divorce decree.
   b. Second, whether the obligations cease on the debtor's death, which is a "hallmark of a support obligation."

---

[10] The *Dennis* factors are also sometimes referred to as *Nunnally* factors, as Sam does. *See* Sam's Reply Br. ¶ 30.

      c. Third, whether the ex-spouse was able to assign the obligation.
      d. Fourth, whether the obligation was subject to being modified upon any subsequent change of circumstances of the parties.
      e. Fifth, whether the payments were to be made over time, as opposed to one lump sum payment.

*Id.* (quoting *Evert*, 342 F.3d at 368-69).

Torie then applies these five factors from *Evert* to the Order Amending Judgment to support her argument that the debt created by the Investment Provision is in the nature of support and thus is nondischargeable as a matter of law. Torie's Reply Br. ¶¶ 16-31. Because she reads four of the five factors from *Evert* to weigh in favor of a conclusion that the debt created by the Investment Provision constitutes a support obligation, she argues that the language creating the Investment Provision clearly demonstrates the parties' intent to create an obligation that is in the nature of spousal support under § 101(14A). *Id.* ¶ 18. Torie also argues that the Los Angeles Superior Court read the Order Amending Judgment as she does in the 2007 Decision, given that it explicitly found that the Investment Provision was created because Torie wanted continued support and Sam wanted to avoid a judicial support award. *Id.* ¶¶ 32-35.

In response, Sam makes a variety of arguments for his position that the Order Amending Judgment clearly demonstrates the parties' intent not to create a support obligation. First, he argues that the Order Amending Judgment is "in the nature of a dischargeable property settlement agreement or investment contract and not a 'domestic support obligation.'" Sam's Response Brief ¶ 1. He also emphasizes that the Investment Provision was part of a contractual settlement, *id.* ¶ 33, and could be suspended at Torie's option, *id.* ¶ 35. From Sam's perspective, the arrangement was nothing more than an investment contract. *Id.* ¶¶ 38-42. Moreover, Sam considers the *Evert* factors irrelevant in light of what he considers unambiguous language in the 2007 Decision regarding the Order Amending Judgment saying that it was a substitute for

support and that spousal support was "zero."  Sam's Reply Br. ¶ 19.  He also points out that the five points articulated by the Fifth Circuit in *Evert* were not necessarily set forth as a five-factor legal test.  *Id.* ¶ 20.

To the extent that the *Evert* factors are relevant, Sam finds all five factors to be either inconclusive or to weigh in his favor.  *Id.* ¶¶ 21-26.  He first argues that the Investment Provision cannot be read to be clearly among other spousal support provisions because the Order Amending Judgment also required Sam to sell a house to Torie, which he calls a "property matter."  *Id.* ¶ 21.  Second, he argues that because the Investment Provision continues until the death of either party, rather than upon Torie's death, that the second factor is "inconclusive at best."  *Id.* ¶ 22.  Third, Sam argues that the Investment Provision is assignable because of text in the Order Amending Judgment making Sam's obligations "inure to the benefit of [Torie] and her heirs, administrators, executors, successors and assigns."  Torie's Ex. 2 ¶ 11, App. 36-37, *quoted in* Sam's Reply Br. ¶¶ 23-24; *see also* Sam's Response Br. ¶ 10.  Fourth, Sam notes that Torie concedes that the Investment Provision is not modifiable.  Fifth, Sam argues that even though the Investment Provision required monthly payments over time, this is inconclusive as to the nature of the obligation because of the annual reconciliation that sometimes provided income to Sam. Sam's Reply Br. ¶ 26.

From this Court's perspective, Torie's arguments are more persuasive and the summary judgment evidence clearly establishes the parties' intent that the debt created by the Investment Provision is in the nature of support.  First, whether the Order Amending Judgment was agreed between the parties or ordered by the Los Angeles Superior Court is irrelevant.  While Sam's Response Brief argues that voluntary, contractual agreement cannot be support obligations, he cites no case supporting this assertion.  On the contrary, the Bankruptcy Code explicitly includes

domestic support obligations created by "a separation agreement, Divorce Judgment, or property settlement agreement."  11 U.S.C. § 101(14A)(C)(i).  Several of the Fifth Circuit cases Sam cites in his briefs have involved agreements rather than awards.  *See Evert*, 342 F.3d 358 (involving an agreed divorce decree); *Dennis*, 25 F.3d 274 (involving a settlement agreement); *Davidson v. Davidson (In re Davidson)*, 947 F.2d 1294 (5th Cir. 1991) (involving a marriage settlement agreement); *Benich*, 811 F.2d 943 (involving a property settlement agreement reduced to judgment); *Crist*, 632 F.2d 1226 (consolidated appeals under the Bankruptcy Act involving a compromise agreement between one couple and a separation agreement incorporated into a divorce decree of another couple).  Accordingly, whether the Investment Provision is contained in an agreement entered into by the parties is irrelevant.

Second, Sam incorrectly asserts that the intent for an obligation to preclude or substitute for domestic support is synonymous with an intent that the obligation not be in the nature of support.  *See* Sam's Response Br. ¶¶ 36-37; Sam's Reply Br. ¶ 15 ("Because the investment deal is admittedly a 'substitute,' then it is *not* the same thing as the 'support' that it replaced.").  In making this argument Sam reads the requisite intent to create a "domestic support obligation" too narrowly.  The Fifth Circuit has repeatedly included "alimony-*substitute*" in its definition of non-dischargeable spousal support.  *Joseph v. Joseph (In re Joseph)*, 16 F.3d 86, 87-88 (5th Cir. 1994) (emphasis added); *see also Biggs*, 907 F.2d at 506 (5th Cir. 1990); *Nunnally v. Nunnally (In re Nunnally)*, 506 F.2d 1024, 1027 (5th Cir. 1975).  In an analogous situation, a claim for ongoing support reduced to judgment remains non-dischargeable if the "*true* nature of the debt," based on the underlying claim, was for spousal support.  *See Dennis*, 25 F.3d at 278; *see also Benich*, 811 F.2d 943 (affirming the non-dischargeability of a Texas state court judgment that awarded a lump sum amount for non-payment of monthly spousal support).  The question of

whether an obligation is spousal support and thus non-dischargeable in bankruptcy turns on the foundation of the obligation and is not controlled by the existence of an actual duty of support under state law. *Yeates*, 807 F.2d at 878 (reversing a bankruptcy court decision and rejecting a test for whether an actual duty of alimony existed). Because it is the foundation of the obligation that matters, an obligation created with the intent to avoid or replace a judicial support award is, in fact, precisely in the nature of spousal support under the Bankruptcy Code.[11] In other words, if an obligation is part of an "overall economic arrangement" that "reflects a balancing of the parties' financial needs," it is in the nature of support. *Joseph*, 16 F.3d at 87-88.

While Sam is correct that *Evert* did not create a formalistic five-factor test, a consideration of those factors, among other things, clearly establishes that Sam's obligation to Torie under the Investment Provision is "in the nature of support." Further explanation is required as set forth below.

In *Evert*, the Fifth Circuit concluded that where there was an "explicit, separate provision for nontrivial alimony in the agreement," and where a note was designated as a division of property, specific attributes of the note precluded its recharactarization as support. *Evert*, 342 F.3d at 368-69.[12] Those attributes were that payments under the note did not cease upon the death of the supported spouse, there was no provision limiting the assignability of the note, the terms of the note were not subject to modification upon changed circumstances, and the note

---

[11] To illustrate this point, consider a hypothetical but typical case involving divorcing spouses who enter into a voluntary separation agreement to avoid a trial. In one section of the hypothetical agreement, explicitly designated as a substitute for a judicial division of marital property, the wife takes possession of the marital home in exchange for a note, payable over time, of an amount equal to half of the couple's equity in the house. In the second section of the hypothetical agreement, explicitly designated as a substitute for a judicial determination of alimony, the wife agrees to pay a monthly sum to the husband until either spouse dies. Suppose that the wife later files for bankruptcy and the husband sues in bankruptcy court for a determination that her obligations to him are not dischargeable. Clearly the word "substitute" in the hypothetical couple's separation agreement, with nothing more, could not turn property division into support or vice versa.

[12] *Evert* involved a claim of exemption under § 522(d)(10)(D) rather than an exception to discharge under § 523(a)(5). *Id.* at 368.

---

equalized the division of marital property. *Id.* at 369. The Fifth Circuit considered the fact that the note was paid over time to be similar to a support obligation, but concluded that this did not outweigh other facts under the circumstances. *Id.* at 369-70.

The Investment Provision at issue here, however, does not share the attributes of the note obligation in *Evert*. Here, there was no meaningful separate provision for spousal support in the Order Amending Judgment, just a one-time payment of an amount roughly equal to half of one month's spousal support under the Divorce Judgment. *See supra* note 4. Unlike in *Evert*, and unlike a property division obligation, the Investment Provision terminates when either spouse dies. Torie's rights under the Investment Provision were not given by a freely assignable promissory note, as they were in *Evert*. It is true that, like a property division, the Investment Provision itself is not modifiable upon changed circumstances, but the Divorce Judgment unequivocally concluded the division of community property with the Equalizing Payment to be made shortly after the Divorce Judgment was entered, and the Divorce Judgment further required any subsequently discovered property to be divided equally. Torie's Ex. 1 ¶¶ 9-10, App. 18-19. The Order Amending Judgment did not revisit the self-contained division of marital property in the Divorce Judgment, so the Investment Provision cannot have had the purpose of dividing marital property. Finally, the Investment Provision provided income to Torie over time rather than in a lump sum, weighing in favor of support.

Moreover, the Court is unconvinced by Sam's argument that the Investment Provision was made assignable because the Order Amending Judgment stated that its provisions "shall inure to the benefit of [Torie] and her heirs, administrators, executors, successors and assigns." Torie's Ex. 2 ¶ 11, App. 36-37. This does not mean the Order Amending Judgment or its provisions are in fact assignable if they otherwise would not be. In California, "[m]arital

settlement agreements incorporated into a dissolution judgment are construed under the statutory rules governing the interpretations of contracts generally." *In re Marriage of Iberti*, 64 Cal. Rptr. 2d 766, 769 (Cal. Ct. App. 4th 1997). A contract for personal services, or a special guarantee for the benefit of a specific oblige, is not freely assignable. *Niederer v. Ferreira*, 234 Cal. Rptr. 779, 788 (Cal. Ct. App. 3d 1987); *Murphy v. Luthy Battery Co.*, 239 P. 341, 343 (Cal. Dist. Ct. App. 1925). Application of these legal principles to the Investment Provision casts doubt upon its assignability. The Order Amending Judgment specified that Samuel Wyly was to personally serve as investment manager. *Id.* ¶ 1, App. 30. The Investment Provision specifies Torie as the obligee of the guaranteed return. *Id.* Regardless, the Court need not decide the assignability of the Investment Provision to conclude that it was not analogous to the promissory note held by the debtor in *Evert*. Assignability was relevant in *Evert* because "the note may be transferred or assigned by the [supported spouse] *while the alimony payments are expressly made non-assignable and non-transferrable*." *Evert*, 342 F.3d at 366 (emphasis added). Here, the Investment Provision is not set off from other provisions of the Order Amending Judgment or the Divorce Judgment which were expressly made non-assignable, and therefore this *Evert* factor does not weigh in Sam's favor.

But *Evert* does not constrain spousal support inquiries to those factors alone. Viewed in the context of the Divorce Judgment it modified, it is clear that the obligation created by the Investment Provision was a support obligation, not a property division. The Order Amending Judgment made no reference to any community property that had been newly discovered, and only sought to amend and/or delete spousal support provisions—*i.e.*, ¶¶ 12, 12.1, and 12.2 of the Divorce Judgment. The Order Amending Judgment provided for monetary support, housing, and medical care, all of which are typical provisions of spousal support awards. Finally, it is relevant

that the $41,666 in guaranteed monthly income from the Investment Provision is virtually identical to the $40,000 in spousal support that was scheduled to terminate, unless extended by the Los Angeles Superior Court, less than a month before the parties reached agreement on Torie's Renewed Motion to Show Cause why spousal support should not be continued as set forth in the Order Amending Judgment.

Moreover, the 2007 Decision bolsters this Court's conclusion that the Investment Provision was intended for spousal support. While this Court is not bound to accept the findings and/or conclusions of a state court when determining the dischargeability of debt because state courts typically do not consider factual issues with bankruptcy in mind, *Dennis*, 25 F.3d at 277-78, this does not mean that a bankruptcy court should reject factual findings and legal conclusions made by a state court following a contested evidentiary hearing spanning several days, particularly where those findings and conclusions are as clearly relevant and thoroughly developed as those contained in the 2007 Decision.

As found in the 2007 Decision, the disputes resolved by the Order Amending Judgment concerned only spousal support, not property division. As just noted, in reaching its conclusions about the Order Amending Judgment, the Los Angeles Superior Court held an evidentiary hearing over eight days in 2005 and 2006. Torie's Ex. 3, App. 40. The primary inquiry concerned the interpretation and application of the Order Amending Judgment. *Id.* at App. 42. After considering the evidence submitted, the Los Angeles Superior Court concluded that the parties' intent in agreeing to the terms of the Order Amending Judgment was nothing other than support, finding that it was a "straightforward and unambiguous" document as written. *Id.* at App. 41.

In Sam's various briefs and at the hearing, Sam makes much of the statement in the 2007 Decision that "the spousal support is now zero under the agreement."   Torie's Ex. 3, App. 55. This statement bears multiple reasonable interpretations, but none support Sam's argument here. This Court reads this statement (and the exhibits attached to the 2007 Decision) as simply a recognition that Torie had withdrawn all of her investment principal from Sam's management by the time the 2007 Decision was entered and thus no spousal support was owing to Torie under the Order Amending Judgment.   Read this way, payments to Torie pursuant to the Investment Provision are explicitly being referred to as spousal support.

Sam and Torie read the statement similarly to each other but differently from the Court. To them, in that paragraph, the 2007 Decision uses "spousal support" only to refer to the monthly cash payments of $40,000 in the Divorce Judgment and the one-time $22,500 cash payment in the Order Amending Judgment.   This is not entirely implausible, but it does not necessarily support Sam's argument that the Investment Provision was other than in the nature of support.   As Torie explains, it could merely refer to the Los Angeles Superior Court's continued jurisdiction to make a judicial award of support payments made directly from Sam to Torie in the future.   California family law practitioners and courts sometimes use the term "spousal support" strictly to mean payments of cash from one spouse to another, when other obligations not called spousal support are nevertheless intended to be in the nature of support.   *See In re Marriage of Garcia*, 274 Cal. Rptr. 194, 200 (Cal. Ct. App. 3d 1990).   Regardless, the fact that the Los Angeles Superior Court said spousal support was zero is less relevant than its finding that the Investment Provision was intended by the parties to provide for Torie's support.

In addition to his argument that the Los Angeles Superior Court found that "the spousal support is now zero under the agreement," which he believes creates a genuine issue of material

fact with respect to whether the debt created by the Investment Provision is in the nature of support, Sam's Response Br. ¶ 58, Sam attempts to show a factual dispute for trial by pointing to two exhibits which may suggest that Torie's clothing boutiques and dog breeding business have been successful, Sam's Exs. C & D.  However, even assuming for the purposes of Torie's Motion that she was receiving significant income from these activities, Sam nevertheless fails to provide even a scintilla of evidence of his own financial situation in June, 1993.  Courts looking behind separation agreements to extrinsic evidence are ultimately focused on "financial disparities" between the parties.  *Dennis*, 25 F.3d at 279.  Sam points to nothing that could reasonably support a conclusion that Torie's financial prospects equaled or exceeded his own. He has also not sketched out any theory in which the Investment Provision could have been any kind of division of marital property, given that the property division was finalized by the express terms of the Divorce Judgment.  Therefore, he has raised no legitimate disputed issue of material fact in opposition to Torie's Motion.

Having thoroughly considered the parties arguments regarding the Order Amending Judgment and the terms of the parties' agreement as set forth in the Order Amending Judgment (as illuminated by the Divorce Judgment and the 2007 Decision), this Court concludes that the terms of the Investment Provision clearly establish the parties' intent to create an obligation in the nature of support within the meaning of § 101(14A) of the Bankruptcy Code.  In fact, substantially all of the terms of the agreement set forth in the Order Amending Judgment reflected ongoing support obligations from Sam to Torie—*i.e.*, Sam's obligation to (i) guarantee a 10% annual return to Torie payable in monthly installments of $41,666, (ii) cause the Malibu house to be sold to Torie for $2,000,000, (iii) make the $400,000 down payment on the Malibu house for Torie's benefit, (iv) provide Torie with health insurance for life, and (v) pay for all of

Torie's health, medical, and hospital expenses in any calendar year if those expenses exceeded 20% of the investment income she actually received pursuant to the Investment Provision.  Thus, Torie's Motion must be granted.

Because (i) Sam's Cross-Motion is predicated on the Court concluding that the Order Amending Judgment is unambiguous in his favor—*i.e.*, that the Order Amending Judgment (as illuminated by the Divorce Judgment and the 2007 Decision) clearly establishes that the Investment Provision is not in the nature of support—and (ii) the Court cannot so conclude, Sam's Cross-Motion must be denied.  Even if the Court were to conclude that the Order Amending Judgment was ambiguous and the nature of the Investment Provision was unclear, Torie has raised a genuine issue of material fact through the evidence contained in Torie's Affidavit such that Sam's Cross-Motion would have to be denied.

IV.     **CONCLUSION**

The Court concludes that the Investment Provision included in the Order Amending Judgment clearly establishes a debt that is in the nature of support in accordance with §§ 523(a)(5) and 101(14A) of the Bankruptcy Code.  Based upon the summary judgment record, there is no disputed issue of material fact for trial.  Accordingly, the obligation created by the Investment Provision is not dischargeable in Sam's bankruptcy case under § 523(a)(5) of the Bankruptcy Code and Torie's Motion will be GRANTED.

For the reasons explained above, Sam's Cross-Motion will be DENIED.

A judgment reflecting this ruling shall be entered separately. The Court hereby directs the parties' counsel to confer with each other and attempt to submit an agreed form of judgment consistent with this Memorandum Opinion and Order to the Court within ten days of the entry of this Memorandum Opinion and Order on the Court's docket. If no agreement can be reached,

each party shall submit its own proposed form of judgment on or before the tenth day after entry of this Memorandum Opinion and Order on the Court's docket, along with an explanation of why the other side's proposed judgment is improper.

**SO ORDERED**.

**### End of Memorandum Opinion and Order ###**